# 11-2804-cr

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

-v.-

CHRISTIAN GATON,

Defendant - Appellant,

Jorge Abreu, Rudy Palma, Rafael Figueroa, AKA Rafael Beato, AKA Liro, AKA Camaron, Jose Hidalgo, AKA C.O. Shield 11440 Jose Rosario, AKA Jose Amaurys, Jimmy Ortiz, Pedro Ventura, Roberto Cristian Urena Almonte, AKA Villa Lona, AKA Christian Urena, AKA Roberto Almonte, Leocadio Hidalgo, AKA C.O. Leo, Leonardo Roque-Santana, AKA Luis M. Mendoza, Guillermo Delacruz, Quilvio Santana, AKA Mayimbe, Victor Diaz, AKA White Horse, Jeffrey Blake, Humberto Sanchez, AKA Chamo,

Defendants.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANT GATON
## PURSUANT TO ANDERS V. CALIFORNIA, 386 U.S. 738 (1967)

Joyce C. London, Esq.
JOYCE C. LONDON, P.C.
*Attorney for Defendant-Appellant*
 *Christian Gaton*
20 Vesey Street, Suite 400
New York, NY, 10007
212-964-3700

Michael A. Young
*Of Counsel*

## TABLE OF CONTENTS

APPENDIX TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . ii

TABLE OF CASES. . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF STATUTES AND OTHER AUTHORITIES. . . . . . . . . . . . .iv

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . .1

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . .1

STATEMENT OF THE ISSUES PRESENTED. . . . . . . . . . . . . . .2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . .3

    ARGUMENT

        AFTER A THOROUGH REVIEW OF THE DISTRICT COURT
        RECORD, COUNSEL FOR DEFENDANT-APPELLANT GATON
        HAS DETERMINED THAT NO NON-FRIVOLOUS ISSUES
        EXIST ON APPEAL.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

i

## APPENDIX TABLE OF CONTENTS

District Court Docket Entries. . . . . . . . . . . . . . . . . 001

Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . 019

Plea Agreement. . . . . . . . . . . . . . . . . . . . . . . . 061

Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . 067

Transcript of Plea Proceeding . . . . . . . . . . . . . . . . 073

Transcript of Sentencing Proceeding . . . . . . . . . . . . . 088

Notice of Appeal. . . . . . . . . . . . . . . . . . . . . . . 113

## TABLE OF CASES

Anders v. California, 386 U.S. 738 (1967) . . . . . . . . . .  13

United States v. Gomez-Perez, 215 F.3d 315 (2d Cir. 2000) . .  13

## TABLE OF STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . 1

## PRELIMINARY STATEMENT

This appeal is from a final judgment of the United States District Court for the Southern District of New York (The Honorable Kimba M. Wood) entered on June 29, 2011 (A067[1]), sentencing appellant Gaton to 405 months of imprisonment and five years of supervised release.

## JURISDICTIONAL STATEMENT

The district court was vested with subject matter jurisdiction pursuant to 18 U.S.C. § 3231 which provides that District Courts of the United States shall have original jurisdiction over all offenses against the laws of the United States. The jurisdiction of this Court is invoked under 28 U.S.C. § 1291 which gives the Courts of Appeals of the United States jurisdiction over appeals from all final decisions of the District Courts of the United States.

---

[1] References proceeded by "A" are to the attached appendix.

## STATEMENT OF THE ISSUES PRESENTED

AFTER A THOROUGH REVIEW OF THE DISTRICT COURT RECORD, COUNSEL FOR DEFENDANT-APPELLANT GATON HAS DETERMINED THAT NO NON-FRIVOLOUS ISSUES EXIST ON APPEAL.

## STATEMENT OF THE CASE

**The Offense**

    A. The Government's version

        On January 26, 2010, defendant-appellant Christian Gaton was charged in eight counts of an eleven count indictment[2]. Count 6, the count to which appellant Gaton eventually pleaded guilty, charged that on November 6. 1994, in the Southern District of New York, Pedro Ventura, Roberto Christian Urena Almonte, a/kin "Cristian Urena,' a/k/a "Villa Lena," and Cristian D. Gaton, during and in relation to a crime of violence and a drug trafficking crime, used, carried and possessed a Tec-9 semi-automatic assault weapon in violation of 18 USC §§ 924(c)(1)(A)(iii) and 924(C)(1)(b)(i) and through the use of said firearm, caused the murder of Celeste Suazo by discharging, and aiding and abetting the discharge of said firearm at Celeste Suazo in the vicinity of 1480 Popham Avenue, Bronx, New York.

        The government alleged that from 1987 up until the filing of the indictment, various of the defendants were members of the Hidalgo organization which was alleged to have engaged in narcotics trafficking, murder and money laundering throughout the New York City Metropolitan area, including Upper Manhattan, the Bronx, Westchester County, and elsewhere.

---

    [2] A copy of the indictment is set forth in the attached appendix at A019 et seq.

The Hidalgo Organization, led by Jose Hidalgo and Elvis Espinosa-Zabala, began trafficking in narcotics and engaging in other criminal activity in about 1987. Starting in about 1987 and continuing to 2002, members and associates of the Hidalgo Organization distributed thousands of kilograms of cocaine and hundreds of kilograms of heroin, in both retail and wholesale quantities, throughout the New York City area.

At various times members and associates of the Hidalgo used violence and threats of violence against other individuals, including in particular other narcotics traffickers, who challenged or posed threats to the Hidalgo Organization's narcotics-trafficking operations or its membership.

By the fall of 1994, the two leaders of the organization - Elvis Espinosa-Zabala and Pedro Ventura - became aware that a competing drug spot had begun operating near the bodego which was their center of operations, and they believed that the competing drug spot was taking customers away from their cocaine business. The competing spot was located at a parking lot on White Plains Road, a few blocks from the bodega, and was operated by Celeste Suazo whose brother ran the parking lot.

In the fall of 1994, Ventura and Zabala decided that Suazo had to be killed in order to eliminate her as a source of competition, and they recruited co-defendant Roberto Urena, and later Urena's brother-in-law, appellant Gaton, to assist in carrying out the murder.

4

On November 6, 1994, Urena and appellant Gaton followed Suazo home from work. While Urena waited in the car, appellant Gaton got out and shot Suazo dead in the courtyard of her building.

A day or two after the murder, appellant Gaton, Urena, and other members of the crew left New York for the Dominican Republic. Appellant Gaton was arrested there on July 17, 2005 and extradited from Dominican Republic to New York on November 15, 2005.

B.  The Defense Version

At the age of twenty, appellant Christian Gaton left the Dominican Republic to join his father in Washington Heights, New York, seeking better employment opportunities. Soon after his arrival, he obtained employment in a local bodega in Washington Heights through his brother-in-law Cristian Urena. This job proved to be his doom, as the bodega was run by Elvis Espinosa-Zabala ("Espinosa") and Pedro Ventura ("Ventura"), both members of the Hidalgo racketeering enterprise. In addition to functioning as a bodega, the store was used by the Hidalgo Organization as one of their drug distribution centers. Thus, appellant Gaton quickly went from the purported legitimate employment of stocking the shelves to becoming subsumed into the illegal activities of the Hidalgo organization.

The Organization led by Hidalgo and Espinosa began trafficking narcotics in 1987, but Gaton did not join until 1994 when he was just twenty-one years old. Espinosa and Hidalgo were

5

ruthless individuals who demanded total loyalty and obedience from their workers. According to the PSR, the murder of Celeste Suazo ("Suazo") was ordered by Hidalgo and Espinosa. The murder was then planned by Espinosa together with co-defendants Pedro Ventura and Cristian Urena, appellant Gaton's brother-in-law. In fact, it was only after a failed attempt by Espinoza and Urena to murder Suazo that appellant Gaton was recruited. Thus, within months of working for the Hidalgo Organization, appellant Gaton was given his first test of loyalty and obedience. He was instructed by Espinosa to murder Suazo, a rival drug dealer who owned a bodega across the street from Espinosa's bodega and who was competing with him for business. As a result of Espinosa's order to kill Suazo, appellant Gaton was informed that he had two alternatives: carry out the order or be killed himself by Espinosa.

In order to ensure that appellant Gaton followed orders and carried out the murder, Espinosa instructed appellant Gaton's brother-in-law and co-defendant, Urena, who had himself already passed the loyalty-through-murder test, to accompany appellant Gaton and act as both the driver and supervisor of the operation.

On the day of the shooting, appellant Gaton spent most of the day drinking and also ingested cocaine. Shortly after the murder, appellant Gaton was provided with an airline ticket and instructed by Espinosa to return to the Dominican Republic. Significantly, appellant Gaton received no remuneration for his participation in the murder of Suazo.

6

**The Pretrial proceedings**

Shortly after appellant Gaton's extradition to the United States, he sustained a severe injury when he fell in his cell at the Metropolitan Detention Center. At that time, appellant Gaton was housed on the top floor in the Special Housing Unit where the roof had leaked into his cell. As appellant Gaton went to the door to accept his meal tray, he slipped on the wet floor, falling backwards and hitting the back of his head on the metal frame of his bunk bed. As a result of the fall, appellant Gaton suffered a brief concussion. He received no medical examination or testing, but was given injections for the pain. Very soon thereafter, appellant Gaton began experiencing severe headaches, and periodically would lose all sensation in his legs, causing him to fall.

About five days after his initial concussion, appellant Gaton experienced an episode of numbness in his legs while walking down some stairs. He then tumbled to the bottom of the stairs, suffering a concussion, further numbness in his legs, and an injury to his tower spinal column. As a result of this fall, he was transported to Lutheran Medical Center and underwent a number of tests. The doctors at Lutheran Hospital could find no objective evidence to support the numbness in his legs and were unable to accurately diagnose appellant Gaton's condition, speculating that it might be neurological or psychological. PSR ¶ 64. Since

7

appellant Gaton's second fall, he has minimal sensation in his legs such that he can only support his own weight for brief moments and has consequently been confined to a wheelchair.

As a result of these injuries, prison authorities proceeded to treat appellant Gaton with such heavy concomitant doses of anti-convulsant, schizophrenic, anti-depressant and other psychotropic and pain medications that his thinking became clouded and he felt as though his brain was "on fire." After his counsel inquired about transferring appellant Gaton to a Federal Medical Center for detoxification and evaluation to definitively determine the cause of his paralysis and pain and to assess his appropriate medication regimen, the prison officials ignored that request and instead increased Gaton's medication and added a new anti-psychotic medication used to treat schizophrenia and bi-polar disorders, thereby increasing his regimen of medications to twenty-two pills a day.

Defense counsel finally was forced to advise the district court that it had become virtually impossible to communicate with appellant Gaton in any meaningful fashion because he was so heavily medicated.

Consequently, on February 26, 2009, the district court entered an order pursuant to 18 U.S.C. § 4241(a) directing that appellant Gaton be psychiatrically examined to determine whether he was suffering from a mental disease or defect rendering him mentally incompetent to stand trial, and also recommending that

appellant Gaton be withdrawn from his psychotropic and/or other medications for the purpose of this psychological evaluation, and also recommending that after withdrawal from medication, appellant Gaton undergo physiological and/or neurological testing to determine whether there is a physical cause for his symptoms.

Appellant Gaton was then transferred to the Federal Bureau of Prisons Medical Facility at Butner, North Carolina, where the ordered evaluation was conducted. In a letter to the Court dated May 27, 2009, the Warden at Butner reported that her staff had concluded that appellant Gaton was not suffering from a mental disease or defect rendering him mentally incompetent to stand trial and that it had been unable to determine any cause for his physical injuries.

On June 8, 2010, appellant Gaton entered into a plea agreement with the government[3] in which he agreed to plead guilty to Count 6 of the indictment, which charged him as described above with participating in the murder of drug dealer Suazo. The agreement specified that the agreed-upon final offense level was 40, with a sentencing range in Criminal History category II of 324 - 405 months.

The agreement also specified that appellant Gaton would not appeal a sentence within or below the stipulated range.

On July 16, 2009, after consenting to proceed before a

_____

[3] A copy of this plea agreement is set forth in the attached appendix at A061 et seq.

Magistrate Judge on a felony plea allocution, appellant Gaton entered a plea of guilty to count six of the indictment[4].

Following the preparation of a Presentence Report by the Probation Department, appellant Gaton's counsel prepared and submitted a sentencing memorandum on June 14, 2011.

At the sentencing proceeding on June 29, 2011, Judge Wood sentenced defendant Gaton at the top of the agreed-upon range to four hundred and five months imprisonment to be followed by five years of supervised release[5].

A timely notice of appeal was filed on July 8, 2011[6].

---

[4] A copy of the transcript of the plea proceeding is set forth in the attached appendix at A073 et seq.

[5] A copy of the transcript of the sentencing proceeding is set forth in the attached appendix at A088 et seq.

[6] A copy of the notice of appeal is set forth in the attached appendix at A113 et seq.

10

## ARGUMENT

**AFTER A THOROUGH REVIEW OF THE DISTRICT COURT RECORD, COUNSEL FOR DEFENDANT-APPELLANT GATON HAS DETERMINED THAT NO NON-FRIVOLOUS ISSUES EXIST ON APPEAL.**

Seven of the eight counts with which Appellant Gaton was charged in this case carried a maximum sentence of life imprisonment and two of them required the imposition of a mandatory life sentences upon conviction.

It appears from the record that the government's evidence was sufficiently strong that had appellant Gaton gone to trial, he would in all likelihood have been convicted on all counts, including the two carrying the mandatory life sentences.

Appellant Gaton's informed decision to enter into a plea agreement with the government which limited his Guidelines sentencing range to 324 - 405 months was therefore reasonable in the context of the case. The plea agreement also stipulated that appellant Gaton would not appeal his sentence if it was within or below this range.

At the plea proceeding, Magistrate Judge Francis first determined through a series of questions that appellant Gaton had knowingly and voluntarily consented to have his plea taken by a magistrate judge. Through further questioning, he then determined that appellant Gaton was understood the nature of the proceeding and was competent to enter a knowing and voluntary plea.

Magistrate Judge Francis then made sure that appellant

11

Gaton fully understood the nature of the offense to which he was pleading guilty and the maximum penalties to which he was exposing himself by doing so. Magistrate Judge Francis then asked appellant Gaton a series of questions to determine that he understood all of the rights which he was giving up by pleading guilty instead of going to trial.

Finally, the court had appellant Gaton explain in his own words what he had done which made him guilty of the crime charged. Appellant Gaton's explanation was sufficient to satisfy all of the elements of the crimes to which he was pleading guilty.

The Probation Department, in preparing the Presentence Investigation Report, thereafter applied the proper section of the Sentencing Guidelines - 2A1.1 - to determine that the base offense level was 43, which, when the three levels for acceptance of responsibility were deducted, resulted in a final offense level of 40 with a sentencing range in Criminal History Category II of 324 - 405 months.

At the sentencing proceeding, the court determined that appellant Gaton had reviewed the PSR with his counsel, and gave both appellant Gaton and his counsel an opportunity to address the court before sentence was imposed. The court then imposed a sentence of 405 months, which was at the top of the range stipulated in the plea agreement.

After carefully examining the district court record, counsel has concluded that there are no non-frivolous issues which

12

could be raised in this appeal. <u>Anders v. California</u>, 386 U.S. 738 (1967). Counsel has further determined that appellant Gaton's plea was knowing, voluntary and competent and that in any event it would not be in his best interest to contest the plea. <u>United States v. Gomez-Perez</u>, 215 F.3d 315, 319 (2d Cir. 2000). Counsel also has concluded that there are no issues in this case which implicate appellant Gaton's constitutional or statutory rights that either cannot be waived or considered waived in light of the circumstances (<u>Id</u>.).

Respectfully submitted,

JOYCE C. LONDON
20 Vesey Street, Suite 400
New York, New York, 10007
212-964-3700

*Attorney for Appellant*
*Christian Gaton*

Michael A. Young
*Of Counsel*

13

## CERTIFICATE OF COMPLIANCE

As of counsel to the counsel of record for Appellant Gaton, I hereby certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. I am relying of the word count of the word-processing system Word Perfect used to prepare the brief, which indicates that 2459 words appear in the brief.

Michael A. Young, Esq.
Of counsel to
JOYCE C. LONDON
20 Vesey Street, Suite 400
New York, New York, 10007
212-964-3700

14