# 11-2804-cr

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

-v.-

CHRISTIAN GATON,

Defendant - Appellant,

Jorge Abreu, Rudy Palma, Rafael Figueroa, AKA Rafael Beato, AKA Liro, AKA
Camaron, Jose Hidalgo, AKA C.O. Shield 11440 Jose Rosario, AKA Jose Amaurys, Jimmy
Ortiz, Pedro Ventura, Roberto Cristian Urena Almonte, AKA Villa Lona, AKA Christian
Urena, AKA Roberto Almonte, Leocadio Hidalgo, AKA C.O. Leo, Leonardo Roque-Santana,
AKA Luis M. Mendoza, Guillermo Delacruz, Quilvio Santana, AKA Mayimbe, Victor Diaz,
AKA White Horse, Jeffrey Blake, Humberto Sanchez, AKA Chamo,
Defendants.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## PART 4

Joyce C. London, Esq.
JOYCE C. LONDON, P.C.
*Attorney for Defendant-Appellant*
*Christian Gaton*
20 Vesey Street, Suite 400
New York, NY, 10007
212-964-3700

Michael A. Young
*Of Counsel*

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4               v.                        02 Cr. 401 (KMW)

5   CRISTIAN GATON,
                                          Sentence
6               Defendant.

7   ------------------------------x

8                                         New York, N.Y.
                                          June 29, 2011
9                                         12:15 p.m.
    Before:
10
            HON. KIMBA M. WOOD
11
                                          District Judge
12

13          APPEARANCES

14

    PREET BHARARA
15      United States Attorney for the
        Southern District of New York
16  DAVID M. RODY
        Assistant United States Attorney
17

18  JOYCE LONDON
        Attorney for Defendant
19

20  JORDAN FOX
        Interpreter (Spanish)
21

22

23

24

25
                            088

16trgats                                                                2

1              (Case called)

2          THE CLERK:  Will counsel please state their

3    appearances.

4          MR. RODY:  Good afternoon, your Honor.  Dave Rody for

5    the government.

6          THE COURT:  Good afternoon.

7          MS. LONDON:  Joyce London for Mr. Gaton.  Good

8    afternoon, your Honor.

9          THE COURT:  Good afternoon.  And good afternoon, Mr.

10   Gaton.

11         THE DEFENDANT:  (Through the interpreter)  Good

12   afternoon.

13         THE COURT:  Ms. London, I understand that you and your

14   client have had an adequate opportunity to review the

15   pre-sentence report.

16         MS. LONDON:  Yes, we have, your Honor.

17         THE COURT:  You ask in your November 12, 2009, letter

18   for a number of corrections to the PSR.  Do you know whether

19   all of those have been made?  My paragraphing in my September

20   2009 PSR report is different from the paragraphing in your

21   November 12 letter, so I'm not sure.

22         MS. LONDON:  Your Honor, it is my understanding at a

23   they were not made.

24         THE COURT:  I will have them made.

25         Mr. Rody, do you want me to read what they are?

16trgats                                                              3

 1           MR. RODY:  No.  I saw them in the letter and I didn't

 2    have any objections to them.  I had actually one myself, Judge,

 3    which is totally minor and doesn't affect this defendant.  I am

 4    just trying to make sure that they didn't -- the latest PSR

 5    that I have as well is I think what you said, Judge.  I have

 6    October 2009.

 7           THE COURT:  I do not have October 2009.  Ms. London?

 8           MS. LONDON:  My most recent one has a sentence date of

 9    October 2009.

10           THE COURT:  It was prepared September 11, 2009, and

11    has a sentence date of October 21, 2009.

12           MR. RODY:  We all have the same one, Judge.

13           MS. LONDON:  Yes.

14           THE COURT:  Fine.  I'll have the changes made to that

15    one.  Mr. Rody, do you want to look for another change you

16    have?

17           MR. RODY:  A totally nonsubstantive as far as this

18    defendant is concerned, change.  In this version, paragraph 14,

19    page 5, talks about named co-defendant José Hidalgo.  It says

20    he was sentenced to 65 months.  He was in fact sentenced to 300

21    months.  He was subsequently in 2011, I believe February,

22    before Judge Daniels, re-sentenced pursuant to Rule 35 to 180

23    months.  But his initial sentence was 300 months.

24           THE COURT:  We'll make that change here.

25           MR. RODY:  Thank you, Judge.

1          THE COURT:  And we will communicate it to the

2    probation office.

3          MR. RODY:  Thank you.

4          THE COURT:  By Judge Daniels?

5          MR. RODY:  Yes, Judge.

6          MS. LONDON:  Your Honor, there is one other correction

7    that is in my sentencing memorandum but that was not in my

8    letter to the probation department, and that concerns the

9    release status on page 1 of the report, on the very first page

10   that is entitled "Pre-Sentence Investigation Report."

11         THE COURT:  All right.

12         MS. LONDON:  The pre-sentence report lists Mr. Gaton's

13   arrest date as November 15, 2005, but he was arrested on these

14   federal charges and the extradition warrant on July 17, 2005.

15   If we add that to the release status, then the burden of proof

16   will include in the calculation of the time that he must spend

17   in custody based on the July 15, 2005 date.

18         THE COURT:  Any objection, Mr. Rody?

19         MR. RODY:  If that's the date that he was first in

20   custody on these charges, we don't object to that.  I don't

21   know whether Ms. London was saying July 17th or July 15th.

22         MS. LONDON:  It's November 15th in the pre-sentence

23   report, and his arrest date in the Dominican Republic, which I

24   believe is actually in the body of the pre-sentence report, was

25   July 17th.

1        MR. RODY:  Thank you.

2        THE COURT:  I'll be glad to hear anything that you and

3   your client wish to say with respect to sentencing.  I note

4   that I have recently received more letters on the defendant's

5   behalf, which I have read.

6        MS. LONDON:  Thank you, your Honor.  I have detailed a

7   lot of what I want the Court to take into consideration in my

8   sentencing memorandum to the Court, but I would like to

9   emphasize a few things.

10       First, Mr. Gaton's troubled childhood in the Dominican

11  Republic.  His father was living already in this country, and

12  then his mother lived in this country for very lengthy periods

13  of time.  During their absence and subsequent to that, there

14  was very traumatic and ongoing episodes in his life that

15  carried over to his teenage years in the form of alcoholism, by

16  the time he was an early teenager, in addition to problems in

17  school.

18       When he came to this country around age 19 or 20, he

19  already had serious alcoholism problems.  When he started

20  working at the bodega in Washington Heights, cocaine addiction

21  was added to that mix.  By age 20 he was essentially a lost

22  young man, very, very much in need of psychiatric help and

23  substance abuse help.

24       His bosses at that bodega and in this criminal

25  organization were ruthless, demanding individuals.  They

1    tolerated no deviance from their orders.  Mr. Gaton was the

2    lowest level worker in that organization.  They made it clear

3    that if their orders weren't followed, the workers were hurt or

4    would possibly be killed.

5         That is the context in which the crime that he has

6    pled guilty to has set his role in this offense.  He was not a

7    manager, organizer, supervisor, leader here.  He didn't partake

8    in the planning of these terrible events.  He was instructed

9    what he had to do.

10        THE COURT:  You say he did not take part in the

11    planning of these events?

12        MS. LONDON:  No, it is my understanding that he did

13    not, your Honor.  It was planned, I believe, by Ventura and

14    Espinoza, and it was Mr. Gaton who was instructed by them and

15    accompanied by his brother-in-law to make sure that he did what

16    they had told him to do.

17        Also, your Honor, I am not and cannot, will not,

18    attempt to condone the conduct.  This murder of Ms. Suozzo

19    should not have happened.  But, and there is a but here, your

20    Honor, all of the things that your Honor has to take into

21    consideration at sentencing, these were not random.  This was

22    not a random murder.  The victim herself certainly played a

23    role in it.

24        Again, my sympathies are very much for the family in

25    that their children should not have had to grow up without a

1   mother.  On the other hand, Ms. Suozzo managed a competing

2   bodega.  She was essentially the equivalent of the Espinoza, I

3   believe, or the Pedro Ventura.

4           She had opened her bodega subsequent to the

5   Espinoza-Ventura bodega, and she, as I understand it, was

6   selling approximately 2 kilos of cocaine or crack per week.

7   She was a real competitor, and she actively solicited, tried to

8   solicit, customers away from the Espinoza- Ventura bodega by

9   telling people on the street to come to her bodega, her product

10  was better, they should try it.  And the competition began.

11          Apparently, as I understand it, Espinoza warned her on

12  a number of occasions that she should move her bodega and she

13  should stop stealing his clients.  But this was not a case

14  where you can go to court and try and enforce your rights, and

15  the antitrust provisions certainly don't apply here.

16          Ms. Suozzo, given the level that she was operating at,

17  would certainly have known that illegal activities, especially

18  narcotics trafficking, complaints and violations and grievances

19  and territorial wars are oftentimes and many times settled by

20  violence.  Guns are part and parcel of this business.

21          So, by being in this business, she put her own family

22  at risk.  She had to know that there was a possibility of

23  push-in robberies at her home, robberies in the bodega, or

24  violence for competition as to who would control that block or

25  that corner.

094

1        The other things that I would like to emphasize in

2   terms of the sentence that Mr. Gaton must serve is his health.

3   I understand the government's position is very different from

4   ours, but I think that there is no question that Mr. Gaton has

5   suffered in terms of his health in the MDC.  There is no

6   question that he did have a number of falls and a concussion.

7   Going back to the episode where we couldn't take a plea because

8   he could not think straight based on the large quantities of

9   psychotropic medications, it is a reality.

10       I would also like to emphasize that Mr. Gaton has

11   considerable family support.  He has relatives who are here

12   today:  His father, his sister, brother-in-law, and family

13   friends.  Tragically, his mother has died recently, since he

14   has been at the MDC.  She had written a letter to the Court.

15   Your Honor does not have the original of that letter, as Mr.

16   Gaton had asked me if he could keep the original.

17       He understands first-hand what it is like to lose a

18   mother.  He has lost his mother while in custody.  He was not

19   able to say good-bye to her or attend her funeral.  He has been

20   separated from his own children now for close to 5, 6 years,

21   and that separation is going to continue, so his children are

22   similarly victims of this whole unhappy episode.

23       I would also like the Court to consider his attempts

24   at cooperation.  They have not resulted in a letter from the

25   government, so I'm certainly not asking for a downward

1   departure, but he has tried.  The information that he provided

2   on Ventura, who was certainly one of the upper echelon leaders

3   in this offense and who planned and was part of ordering the

4   murders, is apparently still loose in the Dominican Republic.

5   It may be hard to catch him, because it is my understanding

6   that he has good contacts in high places there who will help

7   ensure that no arrest does take place.

8            Certainly Mr. Gaton has made very genuine efforts to

9   try and help himself, and he is continuing in those efforts.

10           Finally, with respect to a designation, your Honor, I

11  would ask first that Mr. Gaton be designated to a facility as

12  close as possible to New York.  It also might be beneficial for

13  him, given his health situation and the continuing problems

14  that he has, especially with his back, disks, that there be a

15  medical evaluation at a federal medical center.  And if he is

16  taken to a federal medical center and then transferred, that he

17  be placed at the closest possible facility that does have

18  wheelchair accessible facilities.

19           Thank you, your Honor.

20           THE COURT:  Thank you.

21           Mr. Gaton, there is no requirement for you to speak,

22  but if you would like to speak now, I would be glad to hear

23  you.  The interpreter can come to your side to assist you in

24  speaking.

25           THE DEFENDANT:  Thank you for allowing me to express

Case 11-2804, Document 24-5, 11/04/2011, 439447, Page11 of 27

1  myself.  I would like to apologize to the government of the

2  United States because my activities disturbed the peace and

3  harmony that the United States people have paid for so many

4  sacrifices.  I would like to ask the forgiveness from anyone

5  whom I harmed either directly or indirectly.

6        I thank everyone in this courthouse, especially your

7  Honor for her impartiality and her justice, and the prosecutors

8  as well for professionalism, and my attorney Ms. London for her

9  patience and her devotion.  To my family as well for the

10 problems that I have caused them, and thank God for having

11 provided me with a chance to ask my mother for forgiveness in

12 time.

13        I recognize that I am a sinner.  Since the beginning

14 of the world, we have all been sinners.  As St. Marcos says, he

15 who apologizes from his heart will be forgiven, and we must

16 forgive to be forgiven.  I hope that your sentence is just and

17 irreproachable.  Thank you, your Honor.

18        THE COURT:  Thank you very much.

19        Mr. Rody, would the government like to be heard?

20        MR. RODY:  Yes, Judge.  Thanks.

21        This is a difficult day, Judge.  Every time someone is

22 sentenced for a murder, it's a difficult day, and it is one

23 that everybody here I know takes very seriously.  It is a

24 difficult day most of all for the defendant and his family

25 because no matter what your Honor does, I expect he is going to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    go away for a very long time.  His family is going to be

2    without him for a very long time, his children are going to be

3    without him for a long time, and he, Mr. Gaton, did that to

4    them.

5            I want to try to treat this event with the solemnity

6    that it deserves, but I really do need to correct a few things

7    that Ms. London said, because there are some factual errors.

8            As we said in our letter to the Court of December 17,

9    2010, we are seeking a sentence at the highest end of the

10   guideline range here, which is something around 34½ years.

11   Frankly, I think given that everybody is free of the

12   constraints of the guidelines under Booker, your Honor could go

13   higher and it would be a reasonable and just sentence.

14           The murder that Mr. Gaton pleaded guilty to was a

15   particularly heinous murder.  I have been doing this for 12½

16   years now, and it is one of the worst I've seen.  He executed a

17   woman who was a mother of three.  He fired 25 times from a

18   TEC-9 semiautomatic assault weapon, hit her at least 17 times.

19   I mean riddled this small woman's body with gunshots.

20           One of her sons, who I keep looking around to see if

21   he is here today, I have been in contact with over the years,

22   Michael Jimenez, was about 14 years old at the time, and he

23   grew up without his mother.  To this day he is distraught about

24   it and frustrated and confused and doesn't know why his mother

25   was taken away from him.

1    I have read some of the letters that some of Mr.

2  Gaton's family sent on his behalf, and her heartfelt letters.

3  Like I said, this is a bad day for everybody.  One of them in

4  particular caught my eye.  It was from Sharena Ovalles.  There

5  is a line toward the latter third of it that says, "I get sad

6  every time I think of Alexa, Christian's daughter, because

7  she's growing up without a father, without a role model to

8  follow."  That's what Michael Jimenez and his brothers had to

9  endure when Cristian Gaton took away their mother.

10    A couple of things, some basic facts.  Mr. Gaton very

11  much did participate in the planning of this crime.  There is

12  no question that he was a lower-ranking person in the

13  organization than Elvis Espinosa Ceballo and Pedro Ventura.

14  They were the ones who owned the bodega and they are the ones

15  who came up with the idea of murdering Ms. Suozzo or her

16  brother.

17    They did not own a bodega.  They owned a parking

18  garage or parking lot that was nearby the bodega that Espinoza

19  and Ventura owned on White Plains Road.  I think Ms. London was

20  confusing this with the second murder that Mr. Gaton committed,

21  which was the murder of Damian Bautista on November 20th, 1994.

22  Ms. Suozzo was murdered on November 6, 1994.

23    They were both murdered for the same reason.

24  Essentially they were, at least to the minds of Espinoza and

25  Ventura, stealing customers from their bodega on White Plains

Case 11-2804, Document 24-5, 11/04/2011, 439447, Page14 of 27

1    Road.  But with respect to Suozzo, her brother owned a parking

2    garage or parking lot nearby, and they were apparently selling

3    cocaine out of there.  I don't know where Ms. London came up

4    with the figure of 2 kilos a week or something.  It didn't come

5    from the government.  But they were apparently selling cocaine

6    out of there.

7        The family of Ms. Suozzo has never admitted to us that

8    she was involved in selling drugs.  They don't know, according

9    the family members, why she was killed.  It is our information

10   from our cooperating witnesses that she was involved in the

11   cocaine sales.  But whatever, it's clear that Espinosa and

12   Ventura believed she was.  In that business, as Mr. London

13   says, disputes are handled on the street with violence.

14       There were meetings about this, meetings involving

15   Espinosa and Ventura and Gaton and Urena, and we allege that in

16   the indictment there was at least one, if not more, planning

17   meetings involving Gaton when they sat down.  I'm not saying it

18   was very lengthy or very detailed, but it included a few

19   essentials.

20       Urena was going to drive the car, Gaton was going to

21   be the shooter.  They were going to use a TEC-9 that they had

22   gotten from another member of their criminal organization.

23   Those were details that were conveyed to Gaton.  So I think it

24   is true that he did not come up with the idea, but he was

25   involved in the planning.

1          The second thing is this. He was not ordered to do

2   this, as Ms. London says, in the vein of some lower-ranking

3   person who was going to face some penalty if he didn't do it.

4   Gaton was actually not a member of the organization, based on

5   the information from our cooperating witnesses, really until

6   this murder. He was brother-in-laws with Urena, who had been

7   with these people for years, had been selling drugs with them

8   for years. Gaton very much wanted to join the organization.

9          We charged this as a murder in aid of racketeering in

10  the first instance under 18 U.S.C. Section 1959(a)(1). The

11  theory was, as the statute says, he did this in order to gain

12  entry to the organization. Urena proposed, let me use my

13  brother-in-law, and they said essentially, that sounds good to

14  us. So he wanted to do this to join in this profitable

15  narcotics organization that was selling a whole lot of cocaine

16  and also heroin and had been doing so for years and years.

17         Other things that are minor disputes. Again, I think

18  Ms. London was confusing this with the murder of Damian

19  Bautista. He and his brother did own another competing bodega

20  on White Plains Road. Suozzo, to my information, was never

21  warned by anyone. Damian Bautista was warned several times.

22  Suozzo's brother was apparently warned by the organization.

23         That addresses some of the factual disputes.

24         The reasons why we think a very high sentence is

25  warranted go to, and again I'll return to the nature of the

Case 11-2804, Document 24-5, 11/04/2011, 439447, Page16 of 27

1    crime, it's particularly heinous, it was particularly cold, and

2    the victim was not some other gang leader or something.  Our

3    information was yes, she was involved in the drug business, but

4    she was a mother of three.

5            The probation department, I would note for whatever

6    it's worth, has recommended a sentence at the high end of the

7    range, 405 months, which is not typical.  They did in this

8    case.

9            As far as comparative sentences go and sentencing

10   disparity, your Honor sentenced Cristian Urena to 27 years, and

11   that was minus some time spent in state custody on a writ, etc.

12   Essentially, your Honor's sentence on this crime was 27 years.

13   I believe it would be an unwarranted sentencing disparity to

14   sentence Gaton to the same thing.  He is worse on a couple of

15   levels.

16           Urena was the driver, Gaton was the shooter in two

17   murders for the organization.  Of course, Urena is guilty of

18   those crimes, but he is not the shooter.  I suppose a person

19   could have been dispatched with one gunshot.  He shot her,

20   tried to shoot her, 25 times, hit her 17 times.  That's one

21   thing about Urena.

22           One minor point.  We don't object to a sentencing

23   credit that goes back to I guess July of '05.  If he is in

24   custody as of that date, that's probably warranted.

25           To our mind, the government, Mr. Gaton received

1    several benefits here in taking this plea.  We talk about them

2    in the letter, but I'll review them briefly.  Number one and

3    most importantly, we made him a plea offer.  We could have just

4    said there is no offer, you can go to trial, in which case we

5    are fully confident he would have gotten convicted.  He would

6    then have a mandatory life sentence, and this proceeding could

7    have taken place a lot longer ago and wouldn't be this long.

8            He was charged with murder in aid of racketeering, two

9    counts of it, and I expect that he would have been convicted of

10   both of them.  We gave him a plea offer and gave him the

11   opportunity to someday walk outside a free man.  That's a

12   tremendous benefit.  I think he will still get to do that with

13   a sentence at the high end of the range.

14           We also, in our mind, demonstrated leniency in

15   allowing him to plead guilty to only one count.  We didn't make

16   him plead to the racketeering count, the narcotics conspiracy

17   count, the money laundering counts, the other 924(c) counts.  It

18   was just 924(j).

19           And because we only made him plead guilty -- I say

20   made -- we only offered him a plea to one of the two murder

21   counts, that affected his guidelines because of the grouping

22   rules that your Honor is of course familiar with.  His range

23   would have been I think at least one level if not two levels

24   higher if he had been required to plead guilty as part of the

25   agreement to both murders.  He would have been starting at

1   probably 360 to life.

2       Of course, this was a negotiated disposition and the

3   government got some benefits out of this: An appellate waiver,

4   avoiding the risk of trial, etc. But I think at the end of the

5   day, Gaton really received many benefits.

6       THE COURT: The appellate waiver was a waiver of a

7   sentence within the sentencing guideline range?

8       MR. RODY: Correct, 327 to 405, Judge. I can check

9   that. 324 to 405. I had it in my mind as 27 because it's 27

10   years.

11       The final thing I want to address is we sort of

12   presaged them I guess in the December letter, and that is about

13   Mr. Gaton's medical condition and his attempts to cooperate.

14   We said this at the time. I understand that he was on a lot of

15   medication, and that may have been affecting his head. Our

16   information was the injuries were faked, he does not need to be

17   in a wheelchair, he is not really suffering from some severe

18   medical issue. The doctors have not found anything to be wrong

19   with him, as far as I understand it from all the medical

20   reports.

21       Also, the conclusion of the psychological tests was

22   that he is malingering or that he was malingering any mental

23   effects. So he was faking it. That caused everybody here,

24   probably me in particular, to go through a lot of unnecessary

25   work. That's part of our job, but it is aggravating to

Case 11-2804, Document 24-5, 11/04/2011, 439447, Page19 of 27

1    everybody when it is a waste of time.  It was also a waste of

2    time to the Court.  I'm not speaking as me, I'm talking as a

3    representative of the government, of course.

4          The final thing is Mr. Gaton's attempts to cooperate.

5    He came in for one proffer session.  Not a single iota of

6    anything he told the government has ever been used for any

7    purpose.  Ms. London mentioned the fact that Ventura apparently

8    has contacts in high places in the Dominican Republic which

9    have prevented him from getting arrests.  We agree.  I think

10   that is the reason he hasn't been arrested; it's because of the

11   corrupt Dominican law enforcement and justice system.

12         We have gotten information about him over the years

13   from many different sources, and none of it has ever panned out

14   or led to his arrest.  Of course, the government has no

15   obligation to use anybody's information and to give anybody a

16   benefit that way.

17         The final thing is I don't think his attempts to

18   cooperate cancel out much of anything in terms of his conduct

19   here.  The fact that he was faking things, which I think is

20   demonstrated by the medical reports or at least the

21   psychological reports, really hurts his credibility as a

22   witness for any purpose.  So even though maybe he will be able

23   to provide some piece of information someday that will lead to

24   someone's arrest, he has crippled himself as a witness because

25   of his prior conduct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 11-2804, Document 24-5, 11/04/2011, 439447, Page20 of 27

1    The final thing I would add is the talk of his family

2  support.  Again, with the utmost sympathy for them, and Mr.

3  Gaton spoke eloquently on his own behalf, it is I would say a

4  little too much to hear that his family have been victims or

5  his daughter has been a victim of this whole affair.

6    Obviously, he has victimized people in the past.

7  Having talked about all of the drug dealing that the

8  organization did, bringing in tractor-trailers of hundreds of

9  kilograms of cocaine which was broken down and broken down and

10  broken down and sold who knows where, in what form, and in what

11  quantity, that causes also untold damage to untold people,

12  untold numbers of people.

13    Mr. Gaton has led a life of a lot of crime here and in

14  the Dominican Republic.  The particular crime that he pled

15  guilty to was as bad as it gets in the drug murder business.

16  For that we think that he merits a sentence at the highest end

17  of the guideline range.

18    Thank you, Judge.

19    THE COURT:  Do you wish to respond to any way, Ms.

20  London?

21    MS. LONDON:  Your Honor, yes.  With respect to the

22  probation department's recommendation of a guideline sentence

23  at the high end of the range, I would note that that

24  recommendation is based solely upon the information in the

25  pre-sentence report and did not consider any 3553(a) factors.

Case 11-2804, Document 24-5, 11/04/2011, 439447, Page21 of 27

1          With respect to Mr. Urena's sentence of 27 years,

2    although Mr. Urena was not the shooter, he was responsible for

3    bringing a younger and more vulnerable individual into this.

4    Mr. Gaton, I will accept the government's representation that

5    he was present when some planning was done, but he was told

6    what to do as opposed to suggesting what should be done.  It

7    has always been his belief that he had to do it.

8          With respect to Mr. Rody's blanket statement that Mr.

9    Gaton was malingering, I do take objection to that.  There is

10   certainly in the report some indication that he may have

11   exaggerated symptoms or presented some malingering, but they

12   also gave diagnoses of alcohol dependence, cocaine abuse, and

13   depressive disorder.

14         Some of his medical studies have shown that he has

15   degenerative disk disease.  He has compromised liver

16   functioning as a result of his longstanding alcohol problems.

17   There are things in the report, such as impressions of his

18   mental status were notable for tearfulness, high levels of

19   depressive thinking, moderate anxiety, poor tolerance for

20   physical discomfort, possible malingering, which they even

21   correlated to drug-seeking behavior.

22         All of these point to a man that does have

23   psychological problems.  To say that the fact that he is

24   wheelchair-bound and all of this is a drama is an overstatement

25   and is not an accurate representation of Mr. Gaton's status.

16trgats                                                                         21

```
 1              THE COURT:  Thank you, Ms. London.

 2              I begin, as I must, by calculating the advisory

 3   sentencing guideline range.  I agree with the parties that the

 4   figures in the plea agreement is correct.  Mr. Gaton's total

 5   offense level is 40 and his criminal history category is II.

 6              The nature and circumstances of the offense are very,

 7   very grave.  There are few crimes more heinous than the

 8   shooting of a mother of three children in cold blood for money,

 9   that is, for the prospect of entering a drug conspiracy.  The

10   history and characteristics of Mr. Gaton are that he has a

11   prior felony conviction for criminal possession of a loaded gun

12   in 1996.

13              There is no question but that in order to reflect the

14   seriousness of the offense, promote respect for the law,

15   provide just punishment, to afford adequate deterrence, both

16   individual and general, and to protect the public from further

17   crimes of the defendant, a sentence at the highest end of the

18   advisory sentencing guideline range is appropriate.  In fact,

19   in my view, a much higher sentence could be appropriate.  But I

20   will honor the agreement between the parties.  I know it is not

21   binding on me, but I understand that it was the result of

22   compromise that I will honor.

23              Please stand for sentencing, Mr. Gaton.

24              Can he stand?

25              MS. LONDON:  He can push himself up, your Honor, but
```

1   not for a sustained period.

2              THE COURT:  I'll assume he cannot stand.

3              Mr. Gaton, I sentence you to 405 months in custody.

4   You will be on supervised release for 5 years.  I impose no

5   fine, because you don't have the money to pay a fine.  I impose

6   the special assessment of $100, which is mandatory.

7              The standard and mandatory conditions or release will

8   apply.  In addition, you must obey the immigration laws and

9   comply with the directives of immigration authorities.  You

10  must participate in a program approved by your probation

11  officer, which program may include testing to determine whether

12  you have reverted to using drugs or alcohol.

13             I authorize the release of available drug treatment

14  evaluations and reports to the substance abuse treatment

15  provider as approved by the probation officer.  You will be

16  required to contribute to the costs of services rendered,

17  co-payment, in an amount to be determined by your probation

18  officer based on your ability to pay or the availability of

19  third-party payment.

20             You must participate in an alcohol aftercare treatment

21  program under a co-payment plan, which may include testing via

22  breathalyzer at the direction and discretion of the probation

23  officer.

24             You shall submit your person, residence, place of

25  business, vehicle, or other premises under your control to a

Case 11-2804, Document 24-5, 11/04/2011, 439447, Page24 of 27

1    search on the basis that the probation officer has reasonable

2    belief that contraband or evidence of a violation of the

3    conditions of the release may be found.  The search must be

4    conducted at a reasonable time and in a reasonable manner.

5    Failure to submit to a search may be grounds for revocation.

6    You must inform any other residents that the premises may be

7    subject to search pursuant to this condition.

8          If you are at liberty when your time in the custody of

9    the Bureau of Prisons is finished, you must report to the

10   nearest probation office within 72 hours of your release.  You

11   will be supervised by the district of residence.

12         Are there charges to be dismissed?

13         MR. RODY:  Yes, Judge.  We would move that all

14   underlying indictments be dismissed.

15         THE COURT:  They are dismissed.

16         Is there anything further before I read defendant his

17   appeal rights?

18         MR. RODY:  There is just the matter of that credit,

19   Judge.

20         THE COURT:  I will give him credit.  The sentence I

21   impose of 405 months is imposed with credit for time served

22   back to July 17, 2005, the date upon which I am informed he was

23   arrested on these charges.

24         MR. RODY:  Thank you, Judge.

25         THE COURT:  I will recommend that he be placed in a

Case 11-2804, Document 24-5, 11/04/2011, 439447, Page25 of 27

1   facility appropriate for his medical condition and that it be

2   as close as possible to New York city.

3          Mr. Gaton, you can appeal your conviction if you

4   believe that your guilt plea was somehow unlawful or

5   involuntary or if there is some other fundamental defect in the

6   proceedings that was not waived by your guilty plea.  You also

7   have a statutory right to appeal your sentence under certain

8   circumstances.

9          However, a defendant may waive those rights as part of

10  a plea agreement, and you have entered into a plea agreement

11  which waives some or all of your rights to appeal the sentence

12  itself.  Such waivers are generally enforceable.  But if you

13  believe the waiver is unenforceable, you can present that

14  theory to the appellate court.

15         With few exceptions, any notice of appeal must be

16  filed within 10 days of judgment being entered in your case.

17  If you are not able to pay the cost of an appeal, you may apply

18  for leave to appeal in forma pauperis.  If you request, the

19  clerk of the court will prepare and file a notice of appeal on

20  your behalf.

21         I'd like to add one point to the sentencing, one

22  issue.  Because the question of the defendant's competency was

23  raised and challenged by defense counsel, I note on the record

24  that I have reviewed the forensic evaluation by the mental

25  health department at the federal medical center at Butner,

1  North Carolina, signed by Maureen Riordan, staff psychologist,

2  and Robert Lucking, staff psychologist.

3        I accept that he is capable of communicating with his

4  lawyer meaningfully, attending adequately to court proceedings,

5  and showing proper courtroom behavior if he chooses.  I accept

6  their conclusion that there is no support in the available

7  records for the presence of gross cognitive deficit or serious

8  mental illness that would interfere with his ability to learn

9  and retain any novel legal terms as well as any events

10 pertaining to the charges as reconstructed for him.  I accept

11 the psychologists' view that the defendant was malingering when

12 claiming to be mentally impaired.

13        Thank you, counsel.  We are adjourned.

14        (Adjourned)

15

16

17

18

19

20

21

22

23

24

25

Criminal Notice of Appeal - Form A

## NOTICE OF APPEAL

### United States District Court

Southern _____ District of New York

U.S. DISTRICT COURT
FILED

JUL C 8 2011

D.S.
S.D. OF N.Y.

Caption:
USA _____ v.

Gaton _____

Docket No.: S4 02 Cr 401

Hon. Kimba M. Wood
(District Court Judge)

Notice is hereby given that Defendant Christian Gaton _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment |✓|, other |  _____

entered in this action on June 29, 2011 _____.  (specify)
(date)

This appeal concerns: Conviction only |___| Sentence only |✓| Conviction & Sentence |___| Other |___|

Defendant found guilty by plea |✓| trial |  | N/A |

Offense occurred after November 1, 1987? Yes |✓| No |  N/A [

Date of sentence: 6/29/2011 _____ N/A |___|

Bail/Jail Disposition: Committed |✓| Not committed |  | N/A |

Appellant is represented by counsel? Yes ✓ | No |   If yes, provide the following information:

Defendant's Counsel:  Joyce C. London, Esq

Counsel's Address:  20 Vesey Street, Suite 400

New York, NY 10007

Counsel's Phone:  (212) 964-3700

Assistant U.S. Attorney:  AUSA David Rody

AUSA's Address:  1 St Andrews Plaza

New York, NY 10007

AUSA's Phone:  (212) 637-2304

_____
Signature

113